**WASSERMAN LEGAL LLC**
Jeffrey I. Wasserman
jwasserman@wasslegal.com
1200 Route 22 East
Suite 2000, # 2238
Bridgewater, New Jersey 08807
Telephone: (973) 486-4801
Facsimile: (844) 486-4801

**GABRIELLI LEVITT LLP**
Michael J. Gabrielli
michael@gabriellilaw.com
2426 Eastchester Road, Suite 103
Bronx, New York 10469
Telephone: (718) 708-5322
Facsimile: (718) 708-5966

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
TRENTON DIVISION**

| | |
|---|---|
| DENISE MASON and MADELYN LEVY, on behalf of themselves and all others similarly situated individuals,<br><br>             Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON CONSUMER INC. d/b/a OGX BEAUTY,<br><br>             Defendant. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Denise Mason and Madelyn Levy ("Plaintiffs"), on behalf of themselves and other similarly situated individuals, allege the following Class Action Complaint against Defendant, Johnson & Johnson Consumer Inc. d/b/a OGX Beauty ("OGX" or "Defendant"), upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters, based upon, inter alia, the investigation made by their attorneys – as to all other matters, as follows:

**INTRODUCTION**

1.      This is a nationwide class action brought by Plaintiffs on behalf of themselves and other similarly situated consumers who purchased OGX Ever Straightening + Brazilian Keratin Therapy Shampoo and/or OGX Anti-Breakage + Keratin Oil Shampoo (collectively, the "Products" or "OGX Products") for

personal or household use and not for resale ("Class" or "Class Members").[1]

2.      Plaintiffs purchased the Products because of OGX's uniform false representation that the Products would nourish and repair hair for a full, healthy look. However, undisclosed by Defendant to Plaintiffs and Class Members, and therefore unknown to Plaintiffs and Class Members, the Products contain an ingredient or combination of ingredients that causes significant hair loss and/or scalp irritation upon proper application.

3.      Defendant failed to properly warn consumers of the risks and dangers attendant to the use of such a strong ingredient on their hair and scalp – even well after Defendant knew or should have known of the Products' hazards. Defendant continued to conceal the dangers of the Products by failing to appropriately and fully recall the Products, by continuing to claim the Products were safe when properly applied, and by failing to warn consumers of the dangers attendant to the Products' use.

4.      Defendant's uniform acts and omissions in connection with the development, marketing, sale and delivery of the Products violate the consumer protection laws of the states of residence of Plaintiffs and other members of the Class, breaches OGX's express and implied warranties to Plaintiffs and the Class, and constitutes unjust enrichment by the Defendant.

5.      OGX labeled, advertised, promoted and sold the Products targeting women who wanted smooth, shiny and healthy hair.

6.      Through its labeling and an extensive marketing campaign, including through its website and online advertisements, OGX made a number of express warranties: that the Products contain a keratin formula intended to straighten and smooth hair, add softness and shine, prevent frizzing and breaking, and that the Products make hair "stronger."[2]

7.      However, at least one ingredient in the Products, DMDM hydantoin, is a formaldehyde donor known to slowly leach formaldehyde when coming into contact with water. Formaldehyde is a well-known human carcinogen that can cause cancer and other harmful reactions when absorbed into skin. DMDM hydantoin is considered by the U.S. Food & Drug Administration as one of the top allergens "that cause the most allergic reactions from the use of cosmetic products."[3] The use of DMDM hydantoin, however, is an entirely unnecessary risk because various safer natural alternatives exist.

---

[1] Discovery may demonstrate that additional OGX products are within the scope of this Complaint.

[2] https://www.ogxbeauty.com/shop/brazilian-keratin-therapy/; https://www.ogxbeauty.com/shop/keratin-oil/shampoo-11/

[3] https://www.fda.gov/cosmetics-ingredients/allergens-cosmetics

8.    In fact, for close to a decade, Defendant has known that DMDM hydantoin can cause or contribute to hair loss and scalp irritation when used as a preservative in personal care products. Specifically, in 2012, and in response to pressure from environmental and consumer groups to remove questionable ingredients from its products, Defendant announced that it would "remove a host of potentially harmful chemicals, like formaldehyde, from its line of consumer products by the end of 2015."[4]

9.    Despite having public knowledge since at least 2012 that DMDM hydantoin, as a formaldehyde donor, can cause or contribute to hair loss and scalp irritation, Defendant has continued to include this ingredient as a preservative in its Products.

10.    Although Defendant has, or should have been aware, of the high potential for toxicity or allergic reaction caused by one or more of the ingredients in the Products, it has failed and continues to fail to warn consumers about possible reactions, including hair loss and scalp irritation.

11.    Nowhere on the package labeling or other marketing materials did Defendant warn Plaintiffs and members of the Class that they were at risk of significant hair loss and/or scalp irritation upon proper application of the products. Even Defendant's website fails to recognize any associated risk of reaction to DMDM hydantoin. Accordingly, Defendant misled and deceived the public, and placed their customers in harm's way, all for the sake of increased profits.

12.    Further, consumers reasonably expect that if Defendant, the company primarily responsible for developing, manufacturing marketing and distributing the Products, knew that the Products would or could cause hair loss and/or scalp irritation (whether by proper application or by misapplication), Defendant would make a disclosure to consumers rather than attempting to conceal the problem. By concealing and misrepresenting the Products and the safety and risks of their use, Defendant failed in its duty to provide consumers with adequate information to make an informed decision about the safety and utility of the Products.

13.    Nevertheless, Defendant knew but failed to disclose to Plaintiffs and the Class the danger of hair loss and/or scalp irritation caused by one or more ingredients in the Products, including the formaldehyde donor ingredient, DMDM hydantoin.

14.    Defendant failed to properly warn consumers of the risks and dangers attendant to the use of such a strong preservative and toxicant on their hair and scalp – even well after Defendant knew or should have known of its hazards.

15.    As a result of Defendant's misconduct and misrepresentations, Plaintiffs and putative Class

---

[4] https://www.nytimes.com/2012/08/16/business/johnson-johnson-to-remove-formaldehyde-from-products.html

Members have suffered injury in fact, including economic damages.

16. Plaintiffs bring this suit to halt the unlawful sales and marketing of the Products by Defendant and for damages they sustained as a result. Given the massive quantities of the Products sold all over the country, this class action is the proper vehicle for addressing Defendant's misconduct and for attaining needed relief for those affected.

## JURISDICTION AND VENUE

16. This Court has original jurisdiction over the claims asserted herein individually and on behalf of the Class pursuant to 28 U.S.C. §1332, as amended in 2005 by the Class Action Fairness Act Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds $5,000,000, exclusive of interest and costs; and (2) a substantial number of the members of the proposed class are citizens of a state different from that of Defendant, a corporate entity having a principal place of business in Skillman, New Jersey.

17. This Court has personal jurisdiction over Defendant because it regularly conducts business in this District and purposefully avails itself of the laws of New Jersey to market, promote, distribute, and sell the Products to consumers in New Jersey and this District. Defendant engages in the wrongdoing alleged in this Complaint throughout the United States, including New Jersey. Defendant is authorized to do business in New Jersey and has sufficient contacts with New Jersey and/or otherwise has intentionally availed itself of the markets in New Jersey, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant engages in substantial and not isolated activity within New Jersey, where its headquarters are located.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)2). Defendant resides in this District and substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District.

## APPLICABLE LAW

19. Plaintiffs seek damages and equitable relief on behalf of themselves and the Class Members (i) under federal law as to the federal-law claims, and (ii) under New Jersey law as to the state-law claims. Application of New Jersey law is appropriate because Plaintiffs properly bring this Complaint in this district.

20. Defendant's decision to reside in New Jersey and, at all relevant times, including through the present, to avail itself of the protection of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

21.    New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure the choice of New Jersey state law is not arbitrary or unfair.

22.    New Jersey has a materially greater interest than any other State in enforcing the rights and remedies granted to consumers under the New Jersey laws invoked in this Complaint. These rights and remedies further strong fundamental public policies of the State of New Jersey.

23.    As an alternative to the application of New Jersey law to a nationwide class, for those Class Members who reside in states whose laws do not materially conflict with New Jersey law with respect to the claims and facts alleged here, the Court can and should apply New Jersey law to those Class members' claims.

24.    As an alternative to the application of New Jersey law to a nationwide class, for those Class Members who reside in states whose laws do not materially conflict with New Jersey law with respect to the claims and facts alleged here (the "Sister States"), the Court can and should apply each state's law to their respective Class members' claims.

## PARTIES

25.    During the relevant period, Class Members throughout the United States purchased the Products through numerous brick-and-mortar retail locations. Plaintiffs and Class Members suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices set forth in this Complaint.

26.    Plaintiff, Denise Mason, is a resident of Camden County, New Jersey. She purchased the Defendant's Products at a Walgreens in Lindenwold, New Jersey, during the three years preceding the filing of this Complaint.

27.    After using the Products as intended by Defendant, Plaintiff Mason noticed her hair falling out shortly after the first few uses. Prior to using the Products, Plaintiff Mason had never experienced hair loss.

28.    After using the Products as intended by Defendant, Plaintiff Mason also experienced scalp irritation and, as a result, her scalp became very dry. Prior to using the Products, Plaintiff Mason had never experienced scalp irritation.

29.    In addition, Plaintiff Mason's hair became dry, brittle, and broke off easily after using the Products.

30.     Plaintiff Mason purchased Defendant's Products because she saw the labeling, advertising, and read the packaging, which represented that the products contain a keratin formula intended to "smooth" hair, add "softness" and "shine", prevent "breakage" and split ends, and make hair "stronger." Had she known the truth—that the representations she relied upon in making her purchases were false, misleading, and deceptive and that the Products contain one or more ingredients that could cause a number of side effects, including hair loss and scalp irritation—she would not have purchased the Products at a premium price.

31.     Plaintiff, Madelyn Levy, is a resident of Nassau County, New York. She purchased the Defendant's Products at a Walgreens in Manhasset, New York, during the three years preceding the filing of this Complaint.

32.     After using the Products as intended by Defendant, Plaintiff Levy noticed her hair falling out shortly after the first few uses. Prior to using the Products, Plaintiff Levy had never experienced hair loss.

33.     After using the Products as intended by Defendant, Plaintiff Levy also experienced scalp irritation and, as a result, her scalp became reddened and dry. Prior to using the Products, Plaintiff Levy had never experienced scalp irritation.

34.     Furthermore, Plaintiff Levy's hair became dry, brittle, and broke off easily after using the Products.

35.     Plaintiff Levy purchased Defendant's Products because she saw the labeling, advertising, and read the packaging, which represented that the products contain a keratin formula intended to "smooth" hair, add "softness" and "shine", prevent "breakage" and split ends, and make hair "stronger." Had she known the truth—that the representations she relied upon in making her purchases were false, misleading, and deceptive and that the Products contain one or more ingredients that could cause a number of side effects, including hair loss and scalp irritation—she would not have purchased the Products at a premium price.

36.     Defendant's statements are false and misleading to a reasonable consumer because, as set forth more fully herein, the Products contain DMDM hydantoin, a formaldehyde donor and well-known human carcinogen that can cause cancer and other harmful allergic reactions when absorbed into skin.

37.     Defendant is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Skillman, New Jersey. Defendant manufactures, markets, advertises and distributes the Products throughout New Jersey, New York and the United States. Defendant created and/or authorized the false, misleading and deceptive advertisements, packaging and labeling for the Products.

## SUBSTANTIVE ALLEGATIONS

### A. DMDM Hydantoin is a Formaldehyde-Releasing Preservative and Allergen

38.     Keratin, a type of protein found in hair and nails, is added to hair products to straighten and strengthen hair, as well as to reduce frizz.

39.     As protein is food for microbes, keratin hair products would spoil and have an abbreviated shelf life without added preservatives to extend the life of the product.

40.     There are numerous preservatives that are used in cosmetics and hair products, including formaldehyde donors, many of which have been linked to the development of allergies, dermatitis, hair loss, and even cancer.

41.     Specifically, formaldehyde donors are preservatives that are "added to water-containing cosmetics (which includes personal care products) to prevent the growth of micro-organisms that may enter during manufacture or during their usage."[5]

41.     Despite having intimate knowledge of the risks of using formaldehyde donor preservatives, OGX continues to use the formaldehyde donor, DMDM hydantoin, in its products.

42.     "DMDM hydantoin (dimethylodimethyl hydantoin) is a formaldehyde donor used as a preservative in cosmetic products at concentrations up to 1%."[6] In other words, it is a formaldehyde-releasing preservative ("FRP") used to lengthen the shelf life of personal care products, including hair products.

43.     "An important source of human skin contact with formaldehyde is the use of cosmetics containing formaldehyde-releasers as preservatives."[7]

44.     In personal care products, such as shampoo, "formaldehyde can be added directly, or more often, it can be released from preservatives such as… DMDM hydantoin." Specifically, the formaldehyde

---

[5] de Groot AC, White IR, Flyvholm MA, Lensen G, Coenraads PJ. Formaldehyde-releasers in cosmetics: relationship to formaldehyde contact allergy. Part 1. Characterization, frequency and relevance of sensitization, and frequency of use in cosmetics. Contact Dermatitis. 2010 Jan;62(1):2-17. doi: 10.1111/j.1600-0536.2009.01615.x. PMID: 20136875.

[6] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (Contact Dermatitis, 1988, 18:197-201).

[7] de Groot AC, White IR, Flyvholm MA, Lensen G, Coenraads PJ. Formaldehyde-releasers in cosmetics: relationship to formaldehyde contact allergy. Part 1. Characterization, frequency and relevance of sensitization, and frequency of use in cosmetics. Contact Dermatitis. 2010 Jan;62(1):2-17. doi: 10.1111/j.1600-0536.2009.01615.x. PMID: 20136875.

donor will "release small amounts of formaldehyde over time."[8]

45.    "DMDMH was the 21st most common allergen in the 2005-2006 NACDG standard series. DMDMH is a preservative that contains 0.5% to 2% free formaldehyde and over 17% combined formaldehyde."[9]

46.    For many decades studies and patch tests were performed to determine human reactivity to DMDM hydantoin,[10] including specifically the "relationship between contact allergy to formaldehyde," including "test reactions to DMDM hydantoin."[11]

47.    One study performed in 1987 specifically examined "whether the presence of DMDM hydantoin in cosmetics may cause adverse effects in patients pre-sensitized to formaldehyde."[12] The conclusion was that "aqueous solutions of DMDM hydantoin, in concentrations comparable to those used in cosmetic products, contain enough free formaldehyde to cause dermatitis…" and that despite earlier conclusions that DMDM hydantoin is a safe cosmetic ingredient, "data suggest that an increase in the use of this preservative may also increase the risk of cosmetic dermatitis in patients allergic to formaldehyde."[13] The authors further suggested that cosmetic products with FRPs should have warnings that the products "'contain formaldehyde'… whether present as free formaldehyde or bound by a donor."[14]

48.    Several more recent studies, including a 2015 study "determined that longer storage time and higher temperature increase the amount of formaldehyde released from FRPs and could ultimately lead to more severe health concerns."[15]

49.    In other words, "reactions that generated formaldehyde occur silently as the products sit on

---

[8] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/

[9] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2958195/ (citing Rietschel RL, Fowler JF., Jr. Fisher's Contact Dermatitis. 5th ed. Philadelphia: Lippincott Williams & Wilkins; 2001).

[10] Tudela E, MacPherson C, Maibach HI. Long-term trend in patch test reactions: a 32-year statistical overview (1970-2002), part II. Cutan Ocul Toxicol. 2008;27(3):187-202. doi:10.1080/15569520802143436. PMID: 18988088.

[11] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (Contact Dermatitis, 1988, 18:197-201).

[12] *Id.*
[13] *Id.*

[14] *Id.*

[15] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/(citing Lv, C., Hou, J., Xie, W., & Cheng, H. (2015). Investigation on formaldehyde release from preservatives in cosmetics. International journal of cosmetic science.).

shelves in stores or bathroom cabinets."[16]

50.    Formaldehyde is a known human carcinogen and is recognized as such by the United States National Toxicology Program and the International Agency for Research on Cancer.[17]

51.    With specific regard to FRPs such asl DMDM hydantoin, "the formaldehyde released from FRPs has been linked to cancer, but there is little evidence that FRPs directly cause cancer. However, a mixture of the FRP bromopol and amines, which form nitrosamines, has been found to penetrate skin and cause cancer."[18]

52.    Further, a study in 2010 concluded that "[i]t has been long accepted that formaldehyde-releaser sensitization is attributable to released formaldehyde. However, clinical studies show the existence of patients allergic to formaldehyde-releasers but not to formaldehyde itself."[19] That same study found DMDM hydantoin to be "reactive per se."

53.    Consequently, it is unsurprising that DMDM hydantoin is considered by the U.S. Food & Drug Administration as one of the top allergens "that cause the most allergic reactions from the use of cosmetic products."[20]

54.    Specifically, DMDM hydantoin can "trigger the immune system to release chemical substances such as antibodies," resulting in reactions such as itchiness, red rashes on the skin, or more extreme reactions.[21]

55.    Further, as a person becomes more exposed to an irritant such as DMDM hydantoin over time, the likelihood and severity of the reaction increase. This is called irritant contact dermatitis ("ICD"), which "can occur in any person if the amount and duration of irritant exposure are sufficient to cause direct

---

[16] https://www.ewg.org/research/exposing-cosmetics-cover-up#formaldehyde.

[17] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/(citing International Agency for Research on Cancer. "IARC classifies formaldehyde as carcinogenic to humans." Press release. June 15, 2004.

[18] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/

[19] Kireche M, Gimenez-Arnau E, Lepoittevin JP. Preservatives in cosmetics: reactivity of allergenic formaldehyde-releasers towards amino acids through breakdown products other than formaldehyde. Contact Dermatitis. 2010 Oct;63(4):192-202. doi: 10.1111/j.1600-0536.2010.01770.x. Epub 2010 Aug 20. PMID: 20731691.

[20] https://www.fda.gov/cosmetics-ingredients/allergens-cosmetics

[21] https://www.fda.gov/cosmetics-ingredients/allergens-cosmetics.

epidermal keratinocyte damage."[22]

56.    Likewise, the irritation of the scalp, including ICD, has been linked to hair brittleness and hair loss. Specifically:

> A number of observations have found that premature hair loss may be caused by the poor scalp health associated with either dandruff and seborrheic dermatitis, or psoriasis, indicating that the effect on the pre-emergent hair fiber may alter the anchoring force of the fiber with the follicle, as evidenced by an increased proportion both of catagen and telogen, and of dysplastic anagen hairs (anagen hairs devoid of hair root sheaths) in the trichogram (hair pluck).[23]

57.    As Defendant is surely aware, there is a litany of alternative preservatives that can be used in shampoos and cosmetics that do not release known human carcinogens and allergens, including:

a. Glyoxylic acid (or derivatives thereof);
b. Potassium sorbate and sorbic acid;
c. Citric acid and its salts;
d. Rosemary oil extract;
e. Neem oil extract;
f. Lavender oil;
g. Grapefruit seed extract; and
h. Vinegars.

**B. Defendant's Knowledge of Reactivity and Safety Concerns Involving DMDM Hydantoin**

58.    Environmental and consumer groups have for years pressured Defendant to remove questionable ingredients from its products. For instance, in 2009, the Campaign for Safe Cosmetics, a coalition that includes the Environmental Working Group, analyzed the contents of dozens of products and found that many items contained formaldehyde. Formaldehyde, a carcinogen, is released over time by common preservatives like DMDM hydantoin. In response, in 2012, Defendant announced that it would "remove a host of potentially harmful chemicals, like formaldehyde, from its line of consumer products by the end of 2015."[24]

59.    Defendant thereafter updated its website to include a "Safety and Commitment" page that specifically notes that it will no longer use formaldehyde in any skin care products.[25]

---

[22] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2958195/

[23] Trueb, Ralph M., Henry, Jim P., Davis, Mike G., and Schwartz, Jim R., Scalp Condition Impacts Hair Growth and Retention via Oxidative Stress, Int J Trichology. 2018 Nov-Dec; 10(6): 262–270, doi: 10.4103/ijt.ijt_57_18.

[24] https://www.nytimes.com/2012/08/16/business/johnson-johnson-to-remove-formaldehyde-fromproducts.html

[25] https://safetyandcarecommitment.com/ingredients/preservatives

60.     However, despite the express representation that the Products would no longer contain formaldehyde, the Defendant curiously noted that it would continue to use DMDM hydantoin, which it plainly admits is a "formaldehyde releasing preservative" in the Products.[26]

61.     Notably, despite proudly continuing to use FRPs in the Products, Defendant specifically notes that they will no longer be used in baby care products as it "listened to our consumers' in this regard.[27]

### C. Consumers Have Voiced Their Complaints About the Products for Years

62.     For years, OGX became aware through numerous consumer complaints that its Products were causing a number of side effects, including scalp irritation and hair loss.

63.     A sample of complaints posted on Amazon.com detail scalp reactivity and hair loss as follows:[28]

**KB**

*1.0 out of 5 stars*
*Made my hair fall out*

At first my hair looked great but soon after it started falling out. My hair has come out in fistfuls every time I've washed it since 2 months ago.

**ThatSomeone**

*1.0 out of 5 stars*
*WARNING! Greasy unclean feeling AND leaves hair "straw like" frizzy and breaking! (Scalp and forehead/ears were dried out too!)*

TERRIBLE! Bottom line is at first your hair feels greasy (probably the cocoa butter) and then when it dries it is super drying on your hair AND scalp . . . [a]fter it dried I was fed up with the frizz and dryness so I did a hair mask of oils and was shocked that while I was brushing the oils through my hair was breaking- not falling out as with normal shedding it was BREAKING at random points of the length.

Addition: It's the next day and my hair has finally dried. I wrote my review as it was still wet and well... I'd take away the one star if I could now. It dried out my hair totally to the point it feels like straw and it got super frizzy... my scalp is super dry and itchy and it even affected my forehead! I had dry flaky skin all the way

---

[26] *Id.*

[27] *Id.*

[28]https://www.amazon.com/productreviews/B01AKGR65A/ref=acr_dp_hist_1?ie=UTF8&filterByStar=one_star&reviewer
Type=all_reviews#reviews-filter-bar

down to my eyebrows... my ears too. Basically anything this stuff touched it sucked the moisture out of.

**Kindle Customer**

*1.0 out of 5 stars*
*beware*

This stuff is horrible! I used it for awhile and when I stopped my hair started breaking off, and falling out. My hair was mid back length and now its chin length from the breakage and having to trim off all the splits that looked like dandelion fuzz.

**Amazon Customer**

*1.0 out of 5 stars*
*Switching to another shampoo as this is a total waste of money*

Didn't lead to my expectations. I wanted this shampoo as i did keratin treatment on my hair. The delivery was superfast. I ordered it in the night and got it delivered next afternoon. It just lead to more hairfall and dandruff. Switching to another shampoo as this is a total waste of money.

    64.    Similar complaints have been reported through Walmart.com since at least 2016. A sampling of these follows:[29]

**Reviewed by EnglishRoseEnglishRose**

*Causes Itchy Scalp*
*December 30, 2016*

I bought the Brazilian Keratin Therapy Conditioner first, and I was so pleased with it that a few weeks later I bought the matching shampoo, convinced that I had a winning combination. However, the shampoo seems to dry out my hair and really makes my scalp itch. I do not normally have sensitive skin, so I can only conclude that there's something in the formula that causes this reaction. I have stopped using the shampoo and am very disappointed.

**Reviewed by LeahhhhhhLeahhhhhh**

*Oily and Damaged Hair*
*March 4, 2019*

I have been using the OGX brand for years, so I'm quite disappointed. I started using this just a few months ago, and noticed that my hair was suffering from extreme oil buildup. I figured a change in routine could help, but it did nothing.

---

[29] https://www.walmart.com/reviews/product/329758162?rating=1

After and while using this shampoo, I've been losing a lot of hair, and my hair doesn't seem to be getting better. Will be switching to a different brand in hopes of repairing my damaged hair.

**Reviewed by StephC0416StephC0416**

*Unfortunate*
*January 21, 2019*

I am so sad to be writing this. About 5 years ago, this shampoo was a holy grail for me. Made my hair soft and smooth and helped with frizz. Unfortunately, after using high end products, I purchased this a couple weeks ago. The first time I used it, my hair began breaking off and smelling STRONGLY to formaldehyde!! It was so bad, that the next day, you could still smell it! I haven't used it again, and I've done treatments, but my hair still feels so brittle... so so sad. I'll go back to my other stuff...

**Reviewed by Niki1112Niki1112**

*Worst Shampoo&Conditioner*
*January 31, 2019*

I used this shampoo and conditioner and it just dried out my hair and made it fall out a lot. So I thought maybe it was just this specific type, so I tried another one as well and it only made it worse. It made my hair dry, dull, fall out A Lot and it made my hair tangle. I now use Marc Anthony's range. It works so much better. I do not recommend the Ogx range.

65.    As such, OGX was on notice of the problems with the Products for several years as evidenced by a plethora of consumer complaints throughout the internet related to the Products causing a number of side effects, including skin irritation and/or hair loss.

### C. The OGX Products and the Products' Warranties

66.    The Product labels state that the Products are formulated with keratin to offer various benefits in one system, including that the Products will "smooth" hair, add "softness" and "shine", prevent "breakage" and split ends, and make hair "stronger."

67.    By representing that its keratin Products will "smooth" hair, add "softness" and "shine", prevent "breakage" and split ends, and make hair "stronger," Defendant warranted the Products as being safe, non-toxic hair smoothing solutions.

68.    Plaintiffs and the Class did not and would not expect that application of the Products would cause hair loss and scalp irritation upon proper application.

69.     Plaintiffs and the Class reasonably expected a warning regarding any potential hazard to consumers, especially as the Food, Drug and Cosmetic Act regulations provide that cosmetics that may be hazardous to consumers must bear appropriate warnings.[30]

70.     Defendant continues to this day to advise consumers that these Products are safe to use as directed, without providing any disclosure concerning the complaints of hair loss and scalp irritation with no warnings regarding the side effects that may result from their continued use. Indeed, despite Defendant's knowledge and awareness of hundreds if not thousands of complaints of significant hair loss, breakage, irritation and other side effects caused by the Products, Defendant continues to claim the use of DMDM hydantoin it is safe and permits them to be sold to this day — without providing consumers with any revised warnings or disclosures.

71.     The Products are sold at retail stores such as CVS, Target, Walgreens and Walmart, and through e-commerce websites such as Amazon.com, CVS.com, Target.com, Vitacost.com, Walgreens.com and Walmart.com.

72.     Defendant manufactures, advertises, markets, distributes and sells the Products throughout the United States, including in New Jersey and New York.

### D. Defendant's False and Deceptive Advertising and Labeling of the Products

73.     In violation of 21 U.S.C. § 362(a) and 21 C.F.R. § 701.1(b), Defendant has consistently, falsely and deceptively advertised and labeled the Products in an effort to make consumers believe that the Products' ingredients, including DMDM hydantoin, were safe for use.

74.     Since launching the Products, Defendant has consistently conveyed a uniform, deceptive message to consumers throughout the United States that the Products formulated with formaldehyde donors, including DMDM hydantoin, are safe for use.

75.     These uniform deceptive claims have been made and repeated across a variety of media including Defendant's Products' labels, websites and online promotional materials, and at the point-of-purchase, where they cannot be missed by consumers. In truth, Defendant's claims that DMDM hydantoin is a safe ingredient is false, misleading, and deceptive because the Products' ingredients, including DMDM hydantoin, were not safe, caused serious scalp irritation and hair loss, and do not safely smooth, soften, prevent breakage and/or make hair stronger.

---

[30] http://www.fda.gov/Cosmetics/CosmeticLabelingLabelClaims

76.    Upon information and belief, Defendant knowingly permitted the manufacture and sale of Products that were dangerous and unfit for sale as temporary hair "smoothing" and "strengthening" Products.

77.    Prior to placing the Products into the stream of commerce for sale to Plaintiffs and the Class, Defendant was aware or should have been aware that the Products contained one or more unsafe ingredients, including DMDM hydantoin, that caused significant hair loss and scalp irritation upon proper application and that any instructions and warnings provided with the Products directly to consumers were materially insufficient.

78.    Defendant knew, or but for its reckless indifference would have known, prior to Plaintiffs' and the Class' purchases of the Products that they would continue to receive complaints of hair loss attributed to the Products.

79.    Defendant knew, or but for its reckless indifference would have known, that: (i) the risk of scalp irritation and hair loss was substantial, if not a certainty, (ii) Defendant's customers were unaware of that substantial risk, and (iii) those customers had a reasonable expectation that Defendant would not sell the Products under those conditions.

80.    Despite such knowledge, Defendant did not disclose to prospective purchasers that there was a substantial risk of scalp irritation and hair loss associated with use of the Products. Defendant instead continued to claim that the Products' ingredients, including DMDM hydantoin, were safe, while concealing all the adverse reports filed by consumers.

81.    Defendant further represents that DMDM hydantoin is safe for use in its products; however, Defendant acknowledges that these FRPs are not used in its baby care products.

### E. The Impact of Defendant's False, Misleading and Deceptive Advertising

82.    Defendant intended for consumers to rely upon the representations on the Products' labels and reasonable consumers, including Plaintiffs and the Class, did, in fact, so rely. These representations are often the only source of information consumers can use to make decisions concerning whether to buy and use such products.

83.    Consumers lack the ability to test or independently ascertain the genuineness of product claims of normal everyday consumer products, especially at the point-of-sale. Reasonable customers must therefore rely on consumer product companies, such as OGX, to honestly represent their Products and the Products' attributes on the Products' labels.

84.    At all relevant times, Defendant directed the above-referenced Products' labels, statements,

claims and innuendo, including that the Products smoothed hair, added softness and shine, prevented breakage and split ends, and made hair stronger, to consumers in general and Plaintiffs and all Class Members in particular, as evidenced by their eventual purchases of the Products.

85.     Plaintiffs and Class Members did reasonably rely on Defendant's Product labels, statements, claims and innuendo in deciding to purchase the Products and were thereby deceived.

86.     As a result of Defendant's deceptive labeling and/or marketing campaign, Defendant has caused Plaintiffs and putative Class Members to purchase the Products, which contained one or more unsafe ingredients, including DMDM hydantoin, which do not safely smooth, soften and/or strengthen hair.

87.     Plaintiffs and putative Class Members have been harmed, as they would not have purchased the Products had they known the Products were not safe and would cause side effects, including scalp irritation and hair loss.

88.     As a result of Defendant's misconduct, Defendant was able to sell the Products to at least thousands of consumers throughout the United States — including Plaintiffs and putative Class Members—and realized sizeable profits.

89.     Plaintiffs and putative Class Members were harmed and suffered actual damages in that Plaintiffs and putative Class Members did not receive the benefit of their bargain as purchasers of the Products. Plaintiffs and putative Class Members paid for Products that were unsafe, cause scalp irritation and hair loss, and do not safely smooth, soften and/or strengthen hair.

90.     Defendant developed and knowingly employed a labeling, advertising and/or marketing strategy designed to deceive consumers into believing that the Products contain safe ingredients and can safely smooth, soften and/or strengthen hair.

91.     The purpose of Defendant's scheme is to stimulate sales and enhance Defendant's profits.

92.     As the manufacturer, marketer, advertiser, distributor and/or seller of the Products, Defendant possesses specialized knowledge regarding the Products and the content of the ingredients contained therein.

93.     Defendant knew or should have known, but failed to disclose, that the Products contain one or more unsafe ingredients, including DMDM hydantoin, and do not safely smooth, soften and/or strengthen hair, as labeled and/or marketed by Defendant.

94.     Plaintiffs and putative Class Members were, in fact, misled by Defendant's labeling, representations and marketing of the Products.

95.     The unsafe ingredient(s) and the inability of the Products to safely smooth, soften and/or strengthen hair, leave no reason to purchase these Products at all, since other proven and safer comparably priced products exist.

96.     The Products are defined as "cosmetics" under 21 U.S.C.S. § 321(i) of the Federal Food Drug & Cosmetic Act ("FDCA").

97.     Defendant's deceptive statements violate 21 U.S.C.S. § 362(a), which deems a cosmetic product misbranded when the label contains a statement that is "false or misleading in any particular."

98.     The FDA promulgated regulations for compliance with the FDCA at 21 C.F.R. §§ 701 et seq. (for cosmetics).

99.     The introduction of misbranded cosmetics into interstate commerce is prohibited under the FDCA and all parallel state statutes cited in this Complaint.

100.    Plaintiffs and putative Class Members would not have purchased the Products had they known the Products contained one or more unsafe ingredients and are incapable of safely smoothing, softening and/or strengthening hair. They would not have purchased the Products, or would only have been willing to pay less for them, had they known the truth. Plaintiffs and the Class were injured in an amount up to the purchase price, the difference between the actual value of the Products and the value of the Products as misrepresented to them by Defendant, to be determined by expert testimony at trial. *See,* Orlander v. Staples, Inc., 802 F.3d 289, 302 (2d Cir. 2015) ("the issue of 'price premium' was relevant because it showed that plaintiffs paid more than they would have for the good but for the deceptive practices of the defendant-sellers"); Kacocha v. Nestle Purina Petcare Co., No. 15-CV-5489 (KMK), 2016 U.S. Dist. LEXIS 107097, at *51-52 (S.D.N.Y. Aug. 11, 2016) ("[I]n his Complaint, Plaintiff seeks monetary damages on the grounds that he 'would not have paid the premium price he paid' to buy the Products had he 'known the truth.'…Case law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive."); Koenig v. Boulder Brands, Inc., 995 F.Supp. 2d 274, 288-89 (S.D.N.Y. 2014) ("Plaintiffs claim that, but for Defendants' 'unfair and deceptive practices,' they—and the putative class—would not have purchased, or paid a price premium . . . Plaintiffs claim that they paid price premiums specifically 'based on Defendants' misrepresentations,' and allege that they deserve damages in the amount of either the purchase prices, or the price premiums that they paid . . . Accordingly, the Court finds that Plaintiffs have adequately alleged injury under GBL § 349…").

101.    If the Products were produced in such a way that OGX's representations were truthful, i.e., such that the Products could safely smooth, soften and/or strengthen hair, Plaintiffs would consider purchasing the Products in the future.

102.    Plaintiffs wish to purchase personal care products in the future and have an interest in ensuring that such representations on packaging are honest.

## CLASS ALLEGATIONS

103.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

104.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated individuals within the United States (the "Class" or the "Nationwide Class"), defined as follows:

> **National Class**: All persons in the United States who purchased the Products.
>
> **Consumer Fraud Multi-State Class**: All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who purchased the Products.[31]
>
> **New Jersey Subclass**: All persons in the State of New Jersey who purchased the Products.
>
> **New York Subclass**: All persons in the State of New York who purchased the Products.

105.    Upon information and belief, the scope of the National Class, Consumer Fraud Multi-State Class, New Jersey Subclass and New York Subclass definitions, including temporal scope, may be further refined after discovery of Defendant's and/or third party records.

106.    The National Class, Consumer Fraud Multi-State Class, New Jersey Subclass and the New York Subclass will be referred to collectively throughout the Complaint as the "Class."

107.    Excluded from the Class are (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

---

[31] The States in the consumer fraud multi-state class are limited to those States with similar consumer fraud laws under the facts of this claim: Florida (Fla. Stat. §501.201, et seq.); Illinois (815 Ill. Comp. Stat. 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws §445.901, et seq.); Minnesota (Minn. Stat. §325F.67, et seq.); Missouri (Mo. Rev. Stat. §407.010, et seq.); New Jersey (N.J. Stat. §56:8-1, et seq.); New York (N.Y. Gen. Bus. Law §349, et seq.); and Washington (Wash. Rev. Code §19.86.010, et seq.).

108.    All members of the Class were and are similarly affected by the deceptive advertising of the Defendant, and the relief sought herein is for the benefit of Plaintiffs and members of the Class.

109.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

110.    **Numerosity – Federal Rule of Civil Procedure 23(a)(I).** At this time, Plaintiffs do not know the exact number of the Class members. Based on the annual sales and popularity of the Products, it is readily apparent that the number of consumers in the Class is so large as to make joinder impracticable, if not impossible. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

111.    **Commonality and Predominance –Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

(b)     whether Defendant failed to appropriately warn Class Members of the damage that could result from use of the Products;

(c)     whether Defendant promoted the Products with false and misleading statements of fact and material omissions;

(d)     whether Defendant's marketing, advertising, packaging, labeling, and/or other promotional materials for the Products are deceptive, unfair or misleading;

(e)     whether Defendant breached an express warranty created through the labeling and marketing of the Products;

(f)     whether Defendant breached implied warranties in connection with the Products;

(g)     whether Defendant's acts, omissions or misrepresentations of material facts constitute fraud;

(h)     whether Defendant's acts, omissions or misrepresentations of material facts constitute a breach of contract or common law warranty;

(i)     whether, as a result of Defendant's misconduct as alleged herein, Plaintiffs and the Class suffered an ascertainable loss;

(j)     whether Defendant was unjustly enriched at the expense of the Plaintiffs and Class Members.

(k)     whether Plaintiffs and members of the putative Classes are entitled to monetary damages and, if so, the nature of such relief; and

(l)     whether Plaintiffs and members of the putative Classes are entitled to equitable, declaratory or injunctive relief and, if so, the nature of such relief.

112.    With respect to the New York Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include:

(a)     whether, in violation of § 349 of the New York General Business Law ("GBL"), Defendant engaged in deceptive acts or practices; and

(b)     whether, in violation of GBL § 350, Defendant engaged in false advertising.

113.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves, and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

114.    Plaintiffs' claims are typical of the claims of the National Class and Consumer Fraud Multi-State Class. Plaintiffs are members of a well-defined class of similarly situated persons and the members of the National Class and Consumer Fraud Multi-State Class were similarly affected by Defendant's conduct and are owed the same relief, as alleged in this Complaint. Members of the National Class and Consumer Fraud Multi-State Class are ascertainable from Plaintiffs' description of the class, Defendant's records, and records of third parties accessible through discovery.

115.    Plaintiffs' claims are typical of the claims of the New Jersey Subclass. Plaintiffs are members of a well-defined class of similarly situated persons and the members of the New Jersey Subclass were similarly affected by Defendant's conduct and are owed the same relief, as alleged in this Complaint. Members of the New Jersey Subclass are ascertainable from Plaintiffs' description of the class, Defendant's records, and records of third parties accessible through discovery.

116.    Plaintiffs' claims are typical of the claims of the New York Subclass. Plaintiffs are members of a well-defined class of similarly situated persons and the members of the New York Subclass were similarly affected by Defendant's conduct and are owed the same relief, as alleged in this Complaint. Members of the New York Subclass are ascertainable from Plaintiffs' description of the class, Defendant's records, and records of third parties accessible through discovery.

117.    **Adequacy of Representation - Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, and they have retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Undersigned counsel has represented consumers in a variety of actions where they have sought to protect consumers from fraudulent and deceptive practices.

118.    **Insufficiency of Separate Actions - Federal Rule of Civil Procedure 23(b)(l).** Absent a representative class action, members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Class thus satisfies the requirements of Fed. R. Civ. P. 23(b)(l).

119.    **Predominance and Superiority of Class Action.** The prerequisites to maintaining a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) are met because questions of law and fact common to each Class member predominates over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

120.    Individual joinder of the Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Each Class member has been damaged and is entitled to recovery as a result of the violations alleged herein.

121.    Moreover, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class action treatment will allow those persons similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

122.    Defendant's conduct is generally applicable to the Classes as a whole and Plaintiffs seek, inter alia, equitable remedies with respect to the Classes as a whole. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

123.    Plaintiffs are unaware of any difficulties in managing this case that should preclude class action.

## NOTICE TO ATTORNEY GENERAL OF ACTION

124.    A copy of this Complaint will be mailed to the Attorney General of the State of New Jersey, as required by N.J. Stat. Ann.  Section 56:8-20, upon and at the time of filing of this Complaint.

## CAUSES OF ACTION

### COUNT I

**Violations of New Jersey's Consumer Fraud Act**
**(N.J. Stat. Ann. Section 56:8-1, *et seq.*)**
**(On Behalf of the New Jersey Sub-Class)**

125.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

126.    Plaintiffs, Class Members and Defendant are "persons" within the meaning of the NJCFA.

127.    Plaintiffs and Class Members are "consumers" within the meaning of the NJCFA.

128.    At all relevant times material hereto, Defendant conducted trade and commerce in New Jersey and elsewhere within the meaning of the NJCFA.

129.    The NJCFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

130.    Defendant has engaged in unlawful, deceptive practices in the sale of the defective Products as alleged in more detail elsewhere herein, including: (1) representing that the Products would offer various benefits, including that they will "smooth" hair, add "softness" and "shine", prevent "breakage" and make hair "stronger," despite knowing that the Products contain an ingredient that causes side effects including, but not limited to, hair loss and/or scalp irritation upon proper application, and (2) failing to disclose and/or concealing this known defect.

131.    Defendant knowingly and intentionally omitted and failed to disclose material facts to Plaintiffs and Class Members with respect to the Products, including the fact that the Products contain a formaldehyde-releasing preservative that causes hair loss and scalp irritation upon proper application and that, with normal use, the Products would not perform as represented and for the particular purpose for which they were intended.

132.    Defendant intended to deceive Plaintiffs and Class Members and intended that Plaintiffs and Class Members rely on Defendants' misrepresentations, omissions, and acts of concealment, so that Plaintiffs and Class Members would purchase the Products at a premium price.

133.    Plaintiffs and Class Members, like all objectively reasonable consumers, did not expect the Products to cause hair loss and scalp irritation upon proper application.

134.    Defendant had a duty to disclose the Products contained DMDM hydantoin, a well-known allergen and formaldehyde donor known to slowly leach formaldehyde when coming into contact with water, because:

a.    Defendant was in a superior position to know the true state of facts about the Products' inclusion of DMDM hydantoin as an ingredient;

b.    Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Products contained a well-known allergen and formaldehyde donor until, at the earliest, the first instance of hair loss and/or scalp irritation;

c.    Defendant knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Products contained a well-known allergen and formaldehyde donor prior to the manifestation of symptoms, such as hair loss and/or scalp irritation.

135.    Had Defendant disclosed all material information regarding the Products containing a well-known allergen and formaldehyde donor to Plaintiffs and Class Members, they would not have purchased the Products or would have paid less for them.

136.    The foregoing acts, omissions, and practices directly, foreseeably, and proximately caused Plaintiffs and Class Members to suffer ascertainable losses in the form of, inter alia, money spent to purchase the Products and they are entitled to recover such damages, together with appropriate penalties, including but not limited to treble damages, attorney's fees and costs of suit.

## COUNT II

### Violation of New York General Business Law § 349
### (On Behalf of the New York Sub-Class)

137.    Plaintiff incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

138.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

139.    The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the New York Subclass Members seek monetary damages, compensatory damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

140.    There is no adequate remedy at law.

141.    Defendant misleadingly, inaccurately, and deceptively presented its Products to consumers.

142.    Defendant's improper consumer-oriented conduct—including labeling and advertising that the Products will "smooth" hair, add "softness", prevent "breakage" and make hair "stronger"—is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendant's Products and to use the Products when they otherwise would not have. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

143.    Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for Products that did not—contrary to Defendant's representations—make their hair "smooth", "soft," "shiny", split end-free and/or stronger. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

144.    Defendant's advertising, including online advertising, and the Products' packaging and labeling induced the Plaintiff and the New York Subclass Members to buy Defendant's Products and to pay a premium price for them.

145.    Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

146.    As a result of Defendant's recurring, unlawful deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, compensatory, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

THEREFORE, Plaintiff prays for relief as set forth below.

## COUNT III

### Violation of the New York General Business Law § 350
### (On Behalf of the New York Sub-Class)

147.    Plaintiff incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

148.    The acts of Defendant, as described above, and each of them, constitute unlawful, deceptive and fraudulent business acts and practices.

149.    New York General Business Law § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

150.    GBL § 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

151.    Plaintiff and the members of the New York Subclass are consumers who purchased the Products in New York.

152.    As sellers of goods to the consuming public, Defendant is engaged in the conduct of business, trade, or commerce within the intended ambit of GBL § 350.

153.    Defendant's representations made by statement, word, design, device, sound, or any combination thereof, and also the extent to which Defendant's advertising fails to reveal material facts with respect to the Products, as described above, constitute false advertising in violation of the New York General Business Law.

154.    Defendant's false advertising was knowing and intentional.

155.    Defendant's actions led to direct, foreseeable and proximate injury to Plaintiff and the New York Subclass.

156.    As a consequence of Defendant's deceptive marketing scheme, Plaintiff and the other members of the New York Subclass suffered an ascertainable loss, insofar as they would not have purchased the Products had the truth been known, or would have purchased the Products on different terms, or would otherwise purchase a competing product, and as a result of Defendant's conduct, they received products of less value than what they paid for.

157. By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the New York Subclass for actual damages, injunctive relief, attorneys' fees, and the costs of this suit.

THEREFORE, Plaintiff prays for relief as set forth below.

## COUNT IV

### Violation of State Consumer Fraud Acts
### (On Behalf of the Multi-State Class)

158. Plaintiffs incorporate by reference all the allegations of the preceding paragraphs of this Complaint.

159. The Consumer Fraud Acts of the States in the Multi-State Class[32] prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

160. OGX intended that Plaintiffs and each of the other members of the Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

161. Had the truth been known, Plaintiffs and other Multi-State Class Members would not have purchased OGX's Products.

162. As a result of OGX's use or employment of unfair or deceptive acts or business practices, Plaintiffs and each of the other members of the Multi-State Class have sustained damages in an amount to be proven at trial.

163. In addition, OGX's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT V

### Breach of Express Warranty
### (On Behalf of the National Class)

164. Plaintiffs incorporate by reference all the allegations of the preceding paragraphs of this Complaint.

---

[32] California (Cal. Bus. & Prof. Code §17200, et seq.); Florida (Fla. Stat. §501.201, et seq.); Illinois (815 Ill. Comp. Stat. 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws §445.901, et seq.); Minnesota (Minn. Stat. §325F.67, et seq.); Missouri (Mo. Rev. Stat. §407.010, et seq.); New Jersey (N.J. Stat. §56:8-1, et seq.); New York (N.Y. Gen. Bus. Law §349, et seq.); and Washington (Wash. Rev. Code §19.86.010, et seq.).

165.    Defendant provided Plaintiffs and other members of the Class with written express warranties including, but not limited to, warranties that its falsely labeled Products would "smooth" hair, add "softness", prevent "breakage" and make hair "stronger."

166.    These affirmations of fact or promises by Defendant relate to the goods and became part of the basis of the bargain.

167.    Plaintiffs and members of the Class purchased the falsely labeled Products believing them to conform to the express warranties.

168.    Defendant breached these warranties. This breach resulted in damages to Plaintiffs and other members of the Class, who bought the falsely labeled Products but did not receive the goods as warranted.

169.    Plaintiffs and the members of the Class performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

170.    Plaintiffs, on behalf of themselves and the Class, provided Defendant with pre-suit notice of its breach of the express warranties provided on the label of the Products.

171.    By providing pre-suit notice, Plaintiffs have effectively notified the Defendant of the troublesome nature of its transactions within a reasonable time of discovering the breach.

172.    Despite providing the above notice to the Defendant that the Products do not meet Defendant's warranties and in fact fail in many respects to perform consistent with the Products' representations, Defendant continues to hide the facts from consumers and fails to correct the material misrepresentations regarding the Products.

173.    Actual and/or constructive notice was duly given to Defendant of the breaches of these warranties, and Defendant has yet failed to cure.

174.    Furthermore, Defendant had actual knowledge of the defect in the Products purchased by Plaintiffs, as well as the Products purchased by other members of the National Class, because: (a) it had knowledge of the complaints made by consumers who purchased the Products; and (b) it had knowledge since at least 2012 based on its announcement, in response to pressure from environmental and consumer groups, that it would remove harmful chemicals like formaldehyde from its line of consumer products. Defendant did, in fact, thereafter remove FRPs in its baby products but, to date, has not removed them from the Products at issue herein.

175.    As a proximate result of the breach of warranties by Defendant, Plaintiffs and the other

members of the Class did not receive goods as warranted. Plaintiffs and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial. Among other things, Plaintiffs and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiffs and the Class members known the true facts, they would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Defendant charged for the products.

THEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT VI

### Breach of Implied Warranty
### (On Behalf of the National Class)

176.    Plaintiffs incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

177.    At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be reasonably fit for the purposes for which such products are used, and that products be acceptable in trade for the products' description.

178.    Notwithstanding the aforementioned duty, at the time of delivery, the Products sold to Plaintiffs were not merchantable because they contained a defect that caused side effects including, but not limited to, hair loss and/or scalp irritation upon proper application and, as such, the Products did not otherwise perform as represented.

179.    Defendant was notified that the Products were not merchantable within a reasonable time after the defects became apparent to Plaintiff and the Class.

180.    As a result of the non-merchantability of the Products, Plaintiffs and the Class sustained damages.

181.    On or about January 19, 2021, Plaintiffs mailed a notice letter to Defendant on behalf of themselves and all other persons similarly situated.

182.    Furthermore, Defendant had actual knowledge of the defect in the Products purchased by Plaintiff, as well as the Products purchased by other members of the National Class, because: (a) it had knowledge of the complaints made by consumers who purchased the Products; and (b) it had knowledge since at least 2012 based on its announcement, in response to pressure from environmental and consumer groups, that it would remove harmful chemicals like formaldehyde from its line of consumer products. Defendant did,

in fact, thereafter remove FRPs in its baby products but, to date, has not removed them from the Products at issue herein.

## COUNT VII

### Common Law Fraud
### (On Behalf of the Class)

183.    Plaintiffs incorporate by reference all the allegations of the preceding paragraphs of this Complaint.

184.    Defendant intentionally makes materially false and misleading representations regarding the nature of the Products.

185.    Plaintiffs and Class members reasonably relied on Defendant's false and misleading representations. They did not know, and had no reason to know, that the Products contain a formaldehyde-releasing preservative that causes hair loss and scalp irritation upon proper application and, as such, the Products would not otherwise perform as represented and for the particular purpose for which they were intended. They would not have purchased the Products had they known the truth.

186.    Defendant knew and intended that Plaintiffs and the Class members would rely on their misrepresentations.

187.    Plaintiffs and Class members have been injured as a result of Defendant's fraudulent conduct.

188.    Defendant is liable to Plaintiffs and Class members for damages sustained as a result of Defendant's fraud.

## COUNT VIII

### Unjust Enrichment
### (On Behalf of the Class)

189.    Plaintiffs bring this claim on behalf of themselves and on behalf of members of the Class as an alternative to their Express Warranty Claim.

190.    Plaintiffs and the Class conferred a benefit on Defendant by purchasing the Products.

191.    As set forth above, Defendant engaged in fraudulent conduct that misrepresented the Products would "smooth" hair, add "softness", prevent "breakage" and make hair "stronger." Defendant did not inform consumers, however, that the Products contain a formaldehyde-releasing preservative that causes hair loss and scalp irritation upon proper application and, as such, the Products would not otherwise perform as represented

and for the particular purpose for which they were intended.

192.    As a result of Defendant's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of its Products, Defendant was enriched, at the expense of Plaintiffs and the Class members, through the payment of the purchase price for Defendant's Products.

193.    Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that they received from Plaintiffs and the Class members in light of the fact that the Products purchased by Plaintiffs and the Class members were not what Defendant purported them to be. Thus, it would be unjust or inequitable for Defendant to retain the benefit without restitution to Plaintiffs and the Class members for the monies paid to Defendant for the Products.

194.    By reason of the foregoing, Plaintiffs and Class members are entitled to their actual damages in an amount to be determined at trial, with interest thereon, and disgorgement of all amounts by which Defendant has been unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all other similarly situated members of the Classes, pray for relief and judgment, including entry of an order:

A.    Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Class Counsel;

B.    Declaring that Defendant is financially responsible for notifying Class members of the pendency of this suit;

C.    Declaring that Defendant's conduct violates the statutes and common law referenced herein;

D.    Enjoining Defendant from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

E.    Requiring Defendant to fully and appropriately recall the Products, to remove the claims on its website and elsewhere that the Products are safe to use, and to fully and properly disclose the safety risks associated with the Products to anyone who may still be at risk of buying and using the Products;

F.    Awarding Plaintiffs and members of the Classes statutory damages, as provided by the applicable state consumer protection statutes invoked above;

G.    Disgorging all amounts by which Defendant has been unjustly enriched;

H.      Awarding restitution and all other forms of equitable monetary relief;

I.      Awarding pre-judgment and post-judgment interest on all amounts awarded;

J.      Awarding attorneys' fees and litigation costs to Plaintiffs and members of the Classes;

K.      Awarding civil penalties and punitive damages as permitted by law;

L.      Ordering a jury trial and damages according to proof; and

M.      Ordering such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury. Plaintiffs also respectfully request leave to amend this Complaint to conform to the evidence, if such amendment is needed for trial.

DATED: April 23, 2021

**WASSERMAN LEGAL LLC**

Jeffrey I. Wasserman
jwasserman@wasslegal.com
1200 Route 22 East
Suite 2000, # 2238
Bridgewater, New Jersey 08807
Telephone: (973) 486-4801
Facsimile: (844) 486-4801

**GABRIELLI LEVITT LLP**

Michael J. Gabrielli
michael@gabriellilaw.com
2426 Eastchester Rd., Ste. 103
Bronx, New York 10469
Telephone: (718) 708-5322
Facsimile: (718) 708-5966

*Counsel for Plaintiffs and the Proposed Class*